**In re Roberto OLIGBO, Debtor.**

**Roberto Oligbo, Plaintiff,**

v.

**Albert Louis, Claudine Belony, Jean Gardy Bapteau, Milthy Gomez, Angela Pisciotta, Defendants.**

**Bankruptcy No. 03–26161–ESS.**
**Adversary No. 04–1037–ESS.**

United States Bankruptcy Court,
E.D. New York.

March 30, 2005.

Order Granting Motions in Part
and Denying Cross–Motion
April 28, 2005.

626

Jeff Morganstern, Carle Place, NY, for Roberto Oligbo.

Percy A. Randall, Kew Gardens, NY, for Jean Gardy Bapteau, Angela Pisciotta.

Marianne De Rosa, Jericho, NY, trustee.

**MEMORANDUM DECISION GRANTING IN PART MOTION FOR SUMMARY JUDGMENT, GRANTING IN PART MOTION FOR DEFAULT JUDGMENT, DENYING CROSS–MOTION FOR SUMMARY JUDGMENT, AND GRANTING IN PART MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

ELIZABETH S. STONG, Bankruptcy Judge.

This adversary proceeding was commenced by the filing of a complaint (the "Complaint") by Roberto Oligbo (the "Plaintiff") for a declaratory judgment that he has been the equitable owner of the premises known as 122–14 135th Avenue, Jamaica, New York, 11420 (the "Property") since October 1999, with a right to cure the prepetition default on the mortgage and/or to redeem the mortgage under a Chapter 13 plan, and that upon the mortgage being redeemed, a deed should be executed transferring title to the Property to him ("Count One"); a declaratory judgment that the changing of the locks at the Property and/or the loss or displacement of the Plaintiff's personalty was a willful violation of the automatic stay by Jean Gardy Bapteau ("Bapteau"), and damages, attorneys' fees, and costs ("Count Two"); a declaratory judgment that the Plaintiff's right, title, and interests in the Property were not affected by a foreclosure sale of the Property held on December 5, 2003 ("Count Three"); a declaratory judgment that the Plaintiff has a purchaser's lien against the Property and/or any surplus monies in the amount of $15,000, arising from his down payment to purchase the property from Defendants Albert Louis ("Louis") and Claudine Belony ("Belony"), plus the value of improvements that he made to the Property ("Count Four"); and treble damages against Bapteau arising out of Bapteau's wrongful eviction of the Plaintiff ("Count Five").

The Plaintiff moves for summary judgment against Bapteau on Counts One, Three, and Four of the Complaint under Federal Rule of Civil Procedure 56, as incorporated by Bankruptcy Rule 7056; and for default judgment against Louis, Belony, Milthy Gomez ("Gomez"), and Angela Pisciotta ("Pisciotta") on all Counts under Federal Rule of Civil Procedure 55, as incorporated by Bankruptcy Rule 7055 (the "Motion").

Bapteau opposes the Motion and moves for summary judgment against the Plaintiff under Federal Rule of Civil Procedure 56, as incorporated by Bankruptcy Rule 7056. Bapteau also moves for relief from the automatic stay, or in the alternative, for adequate protection, under 11 U.S.C. § 362. Louis, Belony, Gomez, and Pisciotta have not appeared in this matter, responded to the Complaint, or opposed the Motion.

The matter came before the Court on November 30, 2004, at which counsel for the Plaintiff and counsel for Bapteau appeared and were heard (the "November 30 Hearing"). After consideration of the submissions, the arguments of counsel, and the record before the Court, for the reasons set forth below, the Plaintiff's Motion for summary judgment against Bapteau on Counts One, Three, and Four is granted in part; the Plaintiff's Motion for a default judgment against Gomez, Louis, Belony, and Pisciotta is granted in part; Bapteau's cross-motion for summary judgment is denied; and Bapteau's motion for relief from the automatic stay is granted in part.

### Jurisdiction

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2). The following constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, as incorporated by Bankruptcy Rule 7052.

### Background

#### A. Procedural History

On December 4, 2003 (the "Petition Date"), the Plaintiff filed a voluntary petition for relief under Chapter 13 of Title 11 of the United States Code (the "Bankruptcy Code"). On January 20, 2004, the Plaintiff filed the Complaint against Defendants Louis, Belony, Bapteau, Gomez, and Pisciotta (the "Defendants"). On March 10, 2004, Bapteau filed an answer to the Complaint (the "Answer") and counterclaim (the "Counterclaim") for his attorneys' fees, costs, and expenses. On March 16, 2004, the Plaintiff filed a Reply to the Counterclaim.

On July 22, 2004, the Plaintiff filed a Notice of Motion for Default Judgment against Louis, Belony, Gomez, and Pisciotta on all Counts of the Complaint and for Summary Judgment against Bapteau on Counts One, Three, and Four of the Complaint, a Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's S.J. Br."), an Affidavit of Roberto Oligbo ("Oligbo Aff."), and Statement Pursuant to Rule 7056-1 ("Stmt. Pursuant to Rule 7056-1").

On September 2, 2004, Bapteau filed a Cross Motion for Summary Judgment (the "Cross Motion"); Defendant's Memorandum of Law in Support of Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment ("Bapteau's Opp. Br."); Defendant's Statement of Material Facts as to Which There Is No Genuine Dispute ("Undisputed Facts Stmt."); Defendant's Statement of Material Facts Genuinely in Dispute ("Disputed Facts Stmt."); Affidavit of Angela Pisciotta in Support of Defendant's Cross-Motion for Summary Judgment Motion, Relief from the Automatic Stay and Adequate Protection ("Pisciotta Aff."); Motion for Relief from the Automatic Stay, or in the Alternative, for Adequate Protection against the Plaintiff (the "Lift Stay Motion"), and Defendant's Memorandum of Law in Support of Defendant's Cross-Motion for Summary Judgment, Relief from Automatic Stay, Adequate Protection ("Bapteau's Lift Stay Br.").

On October 13, 2004, the Plaintiff filed a Reply Memorandum ("Plaintiff's Reply Mem.") and Reply Affidavit of Roberto Oligbo ("Oligbo Reply Aff.").

## B. The Parties

The Plaintiff is the Debtor in this bankruptcy case. Gomez is the Plaintiff's former spouse. Louis and Belony entered into a contract to sell the Property to the Plaintiff and Gomez in October 1999, and owned the Property until it was sold at a foreclosure sale on December 5, 2003 (the "Foreclosure Sale"). Bapteau acquired a mortgage on the Property from Greenpoint Bank ("Greenpoint") before the Foreclosure Sale, purchased the Property at the Foreclosure Sale, and holds legal title to the Property. Pisciotta is a rental tenant in a second-floor apartment at the Property.

## C. The Plaintiff's Occupancy of the Property

The following facts are undisputed except where indicated otherwise. The Plaintiff occupied the Property under a written lease (the "Lease") with Louis from January 1, 1996, to December 31, 1999. After that date, the Plaintiff continued to occupy the Property as a month-to-month tenant. The parties dispute whether the Plaintiff occupied the Property on a continuous basis. Oligbo Aff. ¶ 5 and Exh. A (Lease); Disputed Facts Stmt. ¶ 1. Louis and Belony held legal title to the Property from January 1996 until December 2003. Complaint ¶¶ 3, 4.

The Lease provides for a term of January 1, 1996, to December 31, 1999, and monthly rent of $1,000. Oligbo Aff., Exh. A (Lease). The Lease also refers to a Lease Rider dated January 1, 1996, and signed by Louis as landlord and the Plaintiff as tenant (the "Lease Rider"). Oligbo Aff., Exh. A (Lease Rider). The Lease Rider provides that "[t]he Landlord has authorized Roberto Oligbo to be Care-taker of the house at 122–14 135 Avenue, Jamaica, N.Y. 11420," and that he will collect the monthly rent from Pisciotta. Id. The Lease Rider also states that the Plaintiff will "take over the mortgage payment" and that "every rent paid goes towards his mortgage after the deed Transfer." Id. The Lease Rider further states that in the absence of Louis, Belony will be authorized "to sign all documents concerning the sale or deed Transfer." Oligbo Aff., Exh. A (Lease Rider).

In July 2002, the mortgage on the Property held by Greenpoint went into default. Complaint ¶ 17; Oligbo Aff. ¶ 14. On December 3, 2002, Greenpoint commenced a foreclosure action by filing a Summons and Complaint in New York Supreme Court, Queens County. Complaint ¶ 18; Oligbo Aff. ¶ 17. On September 5, 2003, a Judgment of Foreclosure and Sale was entered in the Supreme Court action. Complaint ¶ 19; Oligbo Aff. ¶ 20 and Exh. H (New York Supreme Court, Queens County Judgment of Foreclosure and Sale). In November 2003, the Plaintiff learned through a letter from Greenpoint to Louis and Belony dated October 31, 2003, that Bapteau had acquired the mortgage from Greenpoint pursuant to a transfer agreement. Oligbo Aff. ¶ 19 and Exh. G–2 (assignment of mortgage from Greenpoint to Bapteau). As assignee of the mortgage, Bapteau conducted the Foreclosure Sale on December 5, 2003, and was the successful bidder with a bid of $350,000. Complaint ¶ 20; Oligbo Aff. ¶ 22 and Exh. G–2 (assignment of mortgage from Greenpoint to Bapteau); November 30, 2004, Hearing Record, Transcript ("Tr.") at 35. At the time of the Foreclosure Sale, the balance due on the mortgage was approximately $175,000. Complaint ¶ 21; Oligbo Aff. ¶ 23. Bapteau, as the successful bidder, the mortgagor, and the holder of the mortgage by assignment, forgave the difference between the mortgage and the $350,000 bid. November 30, 2004, Hearing Record, Tr. at 35.

The parties dispute whether the Plaintiff has occupied the Property continuously af-

ter December 31, 1999. Undisputed Facts Stmt. ¶¶ 6, 13; Disputed Facts Stmt. ¶¶ 1, 29; Pisciotta Aff. ¶ 7; Complaint ¶ 10; Oligbo Reply Aff. (I—Reply to Affidavit of Angela Pisciotta ("Reply to Pisciotta Aff.")) ¶ 2(c). The Plaintiff claims that he and his family, including his former spouse Gomez and their children, temporarily moved out of the Property sometime in 2003 in response to pressure from Bapteau and to care for ailing relatives. Oligbo Reply Aff. (Reply to Pisciotta Aff.) ¶ 2(c). The Plaintiff asserts that Gomez' relatives stored their belongings in the garage and basement of the Property and Gomez took those belongings with her when visiting her relatives, causing her temporary absence to appear to be a permanent relocation *Id.* The Plaintiff also claims that he travels and resides with his in-laws for temporary intervals, but has occupied the Property continuously as his permanent residence. *Id.*

In response, Bapteau contends that during the Spring or Summer of 2003, Gomez "brought a moving truck and moved out with her children, but would return periodically to retrieve her mail." Pisciotta Aff. ¶ 7. Bapteau further asserts that in approximately August 2003, the Plaintiff moved out and returned from time to time to collect Pisciotta's rent or retrieve his mail. *Id.* ¶ 8. Pisciotta states that in April or May 2004, Gomez and her children moved back into the Property and currently reside there. *Id.* ¶ 26. Pisciotta states that the Plaintiff still visits the Property to collect his mail. *Id.* ¶ 27.

*D. The Contract of Sale*

The Plaintiff asserts that from the outset of his relationship with Louis, he and

Louis intended that he would purchase the Property. Oligbo Aff. ¶ 5. To this end, on October 29, 1999, Oligbo and Gomez as purchasers and Louis and Belony as sellers entered into a Contract of Sale for the Property (the "Contract"), at a purchase price of $225,000, and a $15,000 down payment. Complaint ¶ 11; Oligbo Aff. ¶ 6 and Exh. B (Contract). The Contract was recorded with the Office of the City Register of the City of New York, Queens County, in March 2001, and the Property was appraised at $225,000 as of February 22, 2001. Oligbo Aff. ¶ 6 and Exh. C (New York City Register Recording and Endorsement Page; Small Residential Income Property Appraisal Report).

The parties dispute whether the Plaintiff paid the down payment required by the Contract. Disputed Facts Stmt. ¶ 3; Bapteau's Opp. Br. at 10; Undisputed Facts Stmt. ¶ 20. The Plaintiff states that he paid the $15,000 down payment to Louis at an attorney's office and provides copies of forty-one postal money orders totaling $15,000 dated October 29, 1999, and December 20, 1999, that were used as payment. Oligbo Aff. ¶ 6 and Exh. B (copies of postal money orders); Oligbo Reply Aff., Exh. C (copies of postal money orders). The Plaintiff also notes that the Contract includes a Supplement to Contract of Sale (the "Supplement") dated October 29, 1999, and signed by the Plaintiff and Gomez as purchasers and Louis and Belony as sellers, which states in part, "[i]n consideration of the sum of $15,000 ... the receipt of which is hereby acknowledged by the Purchasers. The Purchasers agree to sell the property ...." Oligbo Aff., Exh. B (Supplement).[1] *See* Oligbo

---

1. At the November 30 Hearing, Bapteau's counsel argued that the Court should not rely on the Supplement because it states that the purchasers, not the sellers, received the down payment and agreed to sell the Property. The

Plaintiff's counsel responded that the Supplement contained an error and that the references to purchasers and sellers were plainly reversed in error. November 30, 2004, Hearing Record, Tr. at 27.

Reply Aff. (II—Response to Defendant's Statement of Material Facts Genuinely in Dispute ("Reply to Disputed Facts Stmt.")) ¶ 3.

Bapteau contends that the postal money orders do not total $15,000 and disputes that the postal money orders are adequate proof of payment. November 30, 2004, Hearing Record, Tr. at 25; Disputed Facts Stmt. ¶ 3; Bapteau's Opp. Br. at 10; Undisputed Facts Stmt. ¶ 20. Bapteau also argues that the Lease Rider states that the down payment was made by check, and observes that no check has been produced by the Plaintiff. Oligbo Aff., Exh. A (Lease Rider ¶ 13(a)); Disputed Facts Stmt. ¶ 3; Undisputed Facts Stmt. ¶ 20.

The Contract and Supplement appear to state that Closing shall occur within twelve months from the date of the contract signing at the lending institution. Oligbo Aff., Exh. B (Contract; Supplement).[2] In approximately May 2001, the Plaintiff received a commitment for mortgage financing in the amount of $202,500 to purchase the Property. Complaint ¶ 15; Oligbo Aff. ¶ 10 and Exh. E–1 (loan commitment document in the name of Roberto Oligbo dated May 11, 2001, from Fairmont Funding, Ltd.). This mortgage commitment expired in approximately June 2001, and the Plaintiff's cousin, Gbemisola Salako ("Salako"), secured a new commitment for mortgage financing in the amount of $300,000. Oligbo Aff. ¶ 10 and Exh. E–2 (loan commitment document in the name of Salako dated November 5, 2003, from Fremont Investment & Loan). The Plaintiff argues that the mortgage commitment obtained by Salako was intended to pay the purchase price of $225,000, improvements, and

other personal expenses. *Id.* The Plaintiff asserts that Salako, not he, applied for the mortgage because she was more creditworthy and that they intended to take title together. Oligbo Reply Aff. (Reply to Disputed Facts Stmt.) ¶ 7.

The Plaintiff argues that despite the parties' intentions and expectations, the Contract could not be consummated because Louis was incarcerated. Complaint ¶ 16; Oligbo Aff. ¶ 11. The parties dispute whether the Plaintiff met with Louis while he was incarcerated on several occasions in an effort to consummate the transaction, either with Louis or through a third party with a power of attorney. Oligbo Aff. ¶ 12; Disputed Facts Stmt. ¶¶ 8, 9. The Plaintiff argues that correspondence from Louis (using the name Flaubert Blas) to the Plaintiff while Louis was incarcerated confirms that Louis and Belony intended to sell the Property to him at the Contract price of $225,000. Oligbo Aff. ¶ 12(a) and Exh. F (letters from Flaubert Blas to the Plaintiff).[3] The first letter states:

Roberto:

I promised to write you as soon as I made contact with my family. Once again, I apologise [sic] for all the pain that you and your family might have been through.

I am trying my best to have this problem solved. I got in contact with my brother-in-law, girlfriend and my cousin. I assume you know my brother in-law by the name Jacklin Behrmann, my girlfriend Claudine Belony and cousine [sic] Jean Bapteau. Roberto, I spoke with these guys and they promised to take care of everything for me. They have

---

2. The reference to the timing of a closing in the Contract is marked in handwriting and may state "12" or "24" months. *See* Oligbo Aff., Exh. B (Contract). The reference in the Supplement plainly states "twelve months." *See* Oligbo Aff., Exh. B (Supplement).

3. The parties do not dispute that Louis also used the name Flaubert Blas. Bapteau states that Flaubert Blas was sent to prison on or about January 31, 2003. Undisputed Facts Stmt. ¶ 18 and Exh. F (Department of Corrections Inmate Information).

agreed that whenever you are able to obtain loan, from the bank they will be available to close the deal.

I have also explained to them that the amount of the contract remains $225,000. I made them understand that it will not be fair if the amount of the contract changes.

You have investested [sic] so much fixing the house. You have also maintained from 1996 to the present day paying the mortgage. I explained to them that I am keeping the deal like that because when you got the loan and was ready to close on the property I went to jail in Florida.

Please they will contact you, make sure that everything works out fine.

I don't want to keep you waiting anymore because I don't know the time of my release from jail.

Please get this deal done as soon as possible.

Thank you,

Flaubert Blas

Oligbo Aff., Exh. F (first letter from Flaubert Blas to the Plaintiff). The second letter also evidences Louis' intent to close on the Contract and recognizes the Plaintiff's efforts as caretaker of the Property. Oligbo Aff., Exh. F (second letter from Flaubert Blas to the Plaintiff).[4]

The Plaintiff argues that a notarized letter from Belony, dated April 29, 2003, authorizing the Cullen & Dykman law firm to release information on the mortgage to a prospective lender for the Plaintiff in order to facilitate a closing on the Contract, also reflects Louis' and Belony's on-going intention to sell the Property to him. Oligbo Aff. ¶ 12(c) and Exh. F (letter dated April 29, 2003, from Belony to Henry Louis of Cullen & Dykman).

Bapteau contests the validity of the financing obtained on behalf of the Plaintiff by his cousin Salako. Bapteau's Opp. Br. at 6; Disputed Facts Stmt. ¶ 7. He claims that the Contract was abandoned when the Plaintiff did not seek the return of his deposit, make a demand to close out the Contract or request an adjournment, "tender the purchase price[,] . . . file a lis pendens or seek specific performance." Bapteau's Opp. Br. at 6. Bapteau further asserts that the Plaintiff and Gomez abandoned the Contract by procuring Salako as the new purchaser, and claims that the title insurance and mortgage commitment documents establish that Salako, not the Plaintiff, attempted to close on the Contract. Bapteau's Opp. Br. at 6, 9; Disputed Facts Stmt. ¶ 7; Undisputed Facts Stmt. ¶ 22 and Exh. G (conditional loan approval document from Fremont Investment & Loan in the name of Salako). Bapteau argues, but does not offer evidence to show, that a new transaction was created by the substitution of Salako as

---

4. The second letter states:

Hello Roberto,
How are you doing? It's been a long time. I am very sorry it took this long to get in touch with you. I have been in Florida jail house and couldn't reach anybody.
Roberto I know you must be very angry, I kept you waiting on the house deal for a while.
Please take care of the property the way you have been doing. In my next letter to you, I will give you the full details on how to go about the contract we had on the property.

Now that I am in the correctional service center in the NY, I will write you more often so that we can find a solution to closing this deal on the house.
Please I want you to take note, whenever you want to write me in the jail house: My name is Flaubert Blas and the address is P.O. Box 480 Gouverneur Correctional Facility. My Prison number is 03R0586.
Thank you from Flaubert Blas.
Oligbo Aff., Exh. F (second letter from Flaubert Blas to the Plaintiff).

contract vendee, with the following new terms:

1. Transaction price went from $225,000.00 to $425,000.00.

2. Down payment went from $15,000.00 to $125,000.00.

3. Roberto Oligbo and Milthy Gomez were dropped from the transaction.

4. Excess monies over the $225,000.00 purchase price were to be used for improvements and other personal expenses.

Bapteau's Opp. Br. at 9. The Plaintiff denies that these terms were substituted for the prior terms. Oligbo Reply Aff. (Reply to Disputed Facts Stmt.) ¶ 25.

Bapteau asserts that it was the Plaintiff, not Louis, who was unable to consummate the Contract. Disputed Facts Stmt. ¶ 6. Bapteau argues that the record does not establish that Louis was incarcerated or that Bapteau visited Louis while he was incarcerated, and suggests that the Plaintiff could have closed with Louis through a power of attorney. Disputed Facts Stmt. ¶¶ 8, 9. The Plaintiff responds that the record includes correspondence that he received from Louis while Louis was incarcerated, and also notes that Bapteau's submissions include a copy of the New York State Department Corrections Inmate Information showing that Louis was incarcerated. Undisputed Facts Stmt., Exh. F (Department of Corrections Inmate Information); Oligbo Aff., Exh. F (first letter from Flaubert Blas to the Plaintiff); Oligbo Reply Aff. (Reply to Disputed Facts Stmt.) ¶ 8.

*E. The Closings*

The Plaintiff asserts that he sought to close on the Contract but encountered difficulties in obtaining authorization from Louis because Louis was incarcerated, and that he encouraged Louis to execute a power of attorney so that someone else could consummate the transaction on his behalf. Oligbo Aff. ¶¶ 11, 12; Oligbo Reply Aff. (Reply to Disputed Facts Stmt.) ¶ 9. The Plaintiff states that sometime in 2002, he was contacted by a relative of Louis, Jacklin Behrman ("Behrman"). Oligbo Aff. ¶ 15 and Exh. F (first letter from Flaubert Blas to the Plaintiff); Oligbo Reply Aff. (Reply to Disputed Facts Stmt.) ¶ 17. The Plaintiff further states that Behrman spoke with him about consummating the Contract on Louis' behalf, and indicated that he could obtain a power of attorney from Louis for that purpose. Oligbo Aff. ¶ 15. The Plaintiff states that he then also met Bapteau, who was identified as Louis' cousin, and was told that Bapteau would assist the Plaintiff in closing on the Contract. *Id.* ¶ 16. The Plaintiff contends, and Bapteau disputes, that Behrman and Bapteau offered him $20,000 and $50,000 in cash on different unspecified occasions to cancel the Contract and give up the Property, and the Plaintiff declined these offers. *Id.* Disputed Facts Stmt. ¶¶ 17, 20.

The Plaintiff states that closings were scheduled to occur at his mortgage broker's office in November and December 2003. Oligbo Aff. ¶ 18; Oligbo Reply Aff. (Reply to Disputed Facts Stmt.) ¶ 6 and Exh. D (letter dated October 13, 2004, from Parziale, Carroll & Scalia, L.L.C. to Plaintiff's counsel). The Plaintiff states that on the dates when closings were scheduled to occur, he and Salako had the funds to purchase the Property. Oligbo Reply Aff. (Reply to Disputed Facts Stmt.) ¶ 6. On the first scheduled closing date, the Plaintiff, Salako, Behrman, and Bapteau appeared but Belony did not appear and the closing did not occur. Oligbo Aff. ¶ 18. On the second scheduled closing date, the Plaintiff and Salako appeared but Behrman did not appear, so the closing was again postponed. *Id.* On the third scheduled closing date, the Plaintiff and Salako appeared, but neither Behrman nor Bap-

teau appeared. *Id.* The Plaintiff asserts that the prospective lender had the funds for the transaction available at the time of each scheduled closing. *Id.*

Bapteau disputes the Plaintiff's assertions as to the scheduling of the closings. Disputed Facts Stmt. ¶¶ 22–24; Bapteau's Opp. Br. at 6, 10. Bapteau states that the only closing date was set by the Contract on October 29, 2000, and passed without event. Bapteau's Opp. Br. at 6, 8, 10. Bapteau also disputes the occurrence of meetings or acquaintance between the Plaintiff and Behrman or Bapteau. Disputed Facts Stmt. ¶¶ 17–19, 22–24. Bapteau states that the Lease Rider did not give Belony authority to sign title documents for the transfer of the Property. Disputed Facts Stmt. ¶ 4.

*F. The Plaintiff's Investment in and Maintenance of the Property*

The Plaintiff alleges that he paid the mortgage, real estate taxes, homeowners' insurance, and utility bills over an extended period of time while he occupied the Property. Complaint ¶ 14; Oligbo Aff. ¶ 9, Exh. D–1 (Greenpoint mortgage statements; Federal Express mailing labels; United States Postal Service mailing labels), and Exh. D–5 (Keyspan Energy Delivery ("Keyspan") payment coupons). The Plaintiff acknowledges that many of the bills were in the name of Louis and Belony, but asserts that he received and paid the bills that arrived at the Property. Oligbo Aff. ¶ 9. In support of this assertion, the Plaintiff provides Greenpoint mortgage disclosure statements, Federal Express airbills from the Plaintiff and Gomez to Greenpoint, U.S. Postal Service Express Mail receipts from Gomez to Edeline Cave ("Cave"), a friend of Louis, Western Union Money Transfer Forms from Gomez to Cave, and Citibank check copies showing checks drawn on the Plaintiff's account made out to and deposited by Greenpoint. Oligbo Aff., Exh. D–1 (Greenpoint mortgage statements; Federal Express mailing labels; United States Postal Service mailing labels; Western Union money transfer forms; Citibank check copies).

The Plaintiff states that beginning in 1999, he received competing demands for payment of the mortgage from relatives or acquaintances of Louis, and that each of these relatives and acquaintances told the Plaintiff that he or she would pay the mortgage. Oligbo Aff. ¶ 13. The Plaintiff further states that in response to this uncertainty, he stopped sending mortgage payments to Greenpoint. *Id.* During this time, the Plaintiff made some payments to Cave, Louis' friend, with the understanding that Cave was making the mortgage payments to Greenpoint. *Id.* The Plaintiff states that he later learned that Cave was not making the mortgage payments, and that the mortgage went into default and foreclosure in June 2000. *Id.* The Plaintiff further states that after the June 2000 default and foreclosure, he made the necessary arrangements to reinstate the loan. *Id.*

The Plaintiff states that he continued to receive competing demands for mortgage payments from Belony and a cousin of Louis. Oligbo Aff. ¶ 14. It is undisputed that the mortgage again went into default in July 2002. Oligbo Aff. ¶ 14 and Exh. G–1 (letter dated May 2, 2003, from Greenpoint to Community Acceptance). *See* Disputed Facts Stmt. ¶ 16. The Plaintiff further states that despite the foreclosures in 2000 and 2002, he made mortgage payments, either directly or through an intermediary, for an extended period from 1999 to 2002. Oligbo Aff. ¶¶ 9, 13, 14 and Exh. D–1 (Greenpoint mortgage statements; Federal Express mailing labels; United States Postal Service mailing labels); Oligbo Reply Aff. (Reply to Disputed Facts Stmt.) ¶¶ 5, 14, 27.

Bapteau disputes that competing demands for mortgage payments led the Plaintiff to stop sending mortgage payments to Greenpoint. Disputed Facts Stmt. ¶¶ 11, 12, 15. Bapteau states that the Plaintiff did not make the mortgage payments and did not have sufficient income to do so. Disputed Facts Stmt. ¶¶ 11, 16. Bapteau also denies that the Plaintiff made payments to Cave, denies that any such payments related to the Property, and denies that there is a connection between Louis and Cave. Disputed Facts Stmt. ¶ 12. Bapteau asserts that efforts to reinstate the mortgage were made by Louis or Belony, not the Plaintiff. Disputed Facts Stmt. ¶ 14.

Bapteau disputes that the Plaintiff paid the utility bills at the Property. Disputed Facts Stmt. ¶ 21; Undisputed Facts Stmt. ¶ 10. Bapteau alleges that no cable or phone service was activated on the first floor or basement of the Property at the time of the Foreclosure Sale. Undisputed Facts Stmt. ¶ 7. In support of this assertion, Bapteau provides a "Shut–Off Notice" directed to "Occupant # 1" from Keyspan stating that gas service at the Property would be discontinued on December 12, 2003. Undisputed Facts Stmt. ¶ 8 and Exh. B (Keyspan shut-off notice dated December 12, 2003); Oligbo Reply Aff. (III—Response to Defendant's Statement of Material Facts as to Which There Is No Genuine Dispute ("Reply to Undisputed Facts Stmt.")) ¶ 8. Bapteau also provides a ConEdison bill dated October 21, 2003, that is marked "Final Bill" and shows a balance due of $880.86. Undisputed Facts Stmt. ¶ 9 and Exh. C (ConEdison final bill dated October 21, 2003); Disputed Facts Stmt. ¶ 1. Finally, Bapteau asserts that after the Plaintiff moved his family back into the Property in 2004, he established a new electric service and phone service. Undisputed Facts Stmt. ¶¶ 13–15. Bapteau argues that these show that the Plaintiff did not pay these utility bills or reside

at the Property at the time of the Foreclosure Sale. Undisputed Facts Stmt. ¶¶ 6–15.

The Plaintiff further alleges that he made substantial repairs and improvements to the Property. Complaint ¶ 14; Oligbo Aff. ¶ 9, Exh. D–2 (photographs of roof repairs), Exh. D–3 (receipts for landscaping and other home maintenance), and Exh. D–4 (rent deposit slips). Finally, the Plaintiff also collected rents from Pisciotta, the upstairs tenant, during his occupancy of the Property. Complaint ¶ 14; Oligbo Aff. ¶ 9 and Exh. D–4 (rent deposit slips); Oligbo Reply Aff. (Reply to Undisputed Facts Stmt.) ¶ 17.

Bapteau and Pisciotta dispute that the Plaintiff made repairs and improvements to the Property. Disputed Facts Stmt. ¶ 21; Pisciotta Aff. ¶¶ 14, 19, 20. Pisciotta states that she complained to the Plaintiff about the disrepair of her apartment, including the lack of cold water in the bathroom, dripping water from the kitchen sink, cockroaches, and peeling plaster. Pisciotta Aff. ¶ 14. Pisciotta also states that she was unable to contact the Plaintiff when she had no heat in her apartment on December 4, 2003. *Id.* ¶ 15. Pisciotta further states that she later discovered that the boiler was not functioning and had to be re-filled with water every few days. *Id.* ¶ 19.

The Plaintiff replies that there were delays and disputes over payment of the gas and water bills at times, but service was not cut off. Oligbo Reply Aff. (Reply to Pisciotta Aff.) ¶¶ 2(a), 2(h). The Plaintiff states that Keyspan was aware of Louis' incarceration and held his outstanding balance in abeyance pending the sale of the Property. Oligbo Reply Aff. (Reply to Pisciotta Aff.) ¶ 2(a). The Plaintiff further asserts that he is presently being billed for current charges only. Oligbo Reply Aff. (Reply to Pisciotta Aff.) ¶ 2(a) and Exh. A (Keyspan statement dated September 9,

2004, showing charges of $26.30). The Plaintiff states that electric service from ConEdison was not interrupted; instead, when Gomez moved out, the account was changed over from her name to his. Oligbo Reply Aff. (Reply to Pisciotta Aff.) ¶ 2(g) and Exh. B (April 1, 2004, ConEdison bill addressed to the Plaintiff). And the Plaintiff states that the water bill, like the gas bill, was held in abeyance during Louis' incarceration pending the sale of the Property. Oligbo Reply Aff. (Reply to Pisciotta Aff.) ¶ 2(h).

Finally, as to Pisciotta's complaints about maintenance and services, the Plaintiff asserts that the boiler has an unconventional method of operation, but functions adequately. Oligbo Reply Aff. (Reply to Pisciotta Aff.) ¶ 2(e). The Plaintiff also notes that he has incurred expenses for repairing and maintaining the Property, including contracting for a new boiler and maintaining the lawn. Oligbo Reply Aff. (Reply to Undisputed Facts Stmt.) ¶ 17; Oligbo Reply Aff. (IV—Supplement to Summary Judgment Motion ("Supp. to S.J. Motion")) ¶ 1 and Exh. F–2 (bills and payments for landscaping). The Plaintiff also states that he keeps the walkways free and clear of snow at all times. Oligbo Reply Aff. (Reply to Pisciotta Aff.) ¶ 2(f).

### G. Bapteau's Actions After the Foreclosure Sale

Greenpoint commenced a foreclosure action by filing a Summons and Complaint on December 3, 2002, in New York Supreme Court, Queens County under index number 31268/02. Complaint ¶ 18; Oligbo Aff. ¶ 17 (the "Foreclosure Action"). A Judgment of Foreclosure and Sale was entered on September 5, 2003. Complaint ¶ 19; Oligo Aff. ¶ 20 and Exh. H (New York Supreme Court, Queens County Judgment of Foreclosure and Sale). It is undisputed that the Plaintiff did not receive notice of the foreclosure action.

The Plaintiff alleges that after the Foreclosure Sale on December 5, 2003, "two of the locks to the Property were changed," impeding his access to the Property. Complaint ¶ 24; Oligbo Aff. ¶ 26. He also asserts that the entrance door leading down to the basement was boarded up. Oligbo Reply Aff. (Reply to Disputed Facts Stmt.) ¶ 29. The Plaintiff states that some of his personal property was removed or displaced after the Foreclosure Sale, including financial records and correspondence with Louis, and that this explains his inability to provide more complete records to the Court. Complaint ¶ 25; Oligbo Aff. ¶ 27 and n. 3. The Plaintiff alleges that the police report confirms that the locks to the house were changed as part of an illegal eviction. Oligbo Reply Aff. (Reply to Disputed Facts Stmt.) ¶ 29; Oligbo Aff., Exh. I (police report dated March 9, 2004).

Bapteau disputes that the locks to the Property were changed after the Foreclosure Sale to impede the Plaintiff's access to the premises. Disputed Facts Stmt. ¶ 29. Rather, Bapteau contends, the Plaintiff and his family moved out of the Property before the Foreclosure Sale and attempted to reenter the Property after the sale occurred, so that at the time of the Foreclosure Sale, the first floor and basement of the Property were unoccupied and abandoned. Disputed Facts Stmt. ¶ 29; Undisputed Facts Stmt. ¶ 6; Pisciotta Aff. ¶¶ 7–8. Bapteau also disputes that the Plaintiff's personal property was removed or displaced. Disputed Facts Stmt. ¶¶ 29, 30.

### DISCUSSION

### A. The Standard for Summary Judgment

The Plaintiff and Bapteau each seek summary judgment on some or all of their claims. Federal Rule of Civil Proce-

dure 56, made applicable to this adversary proceeding by Bankruptcy Rule 7056, provides that summary judgment is appropriate when "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "A fact is material only if it affects the result of the proceeding and a fact is in dispute only when the opposing party submits evidence such that a trial would be required to resolve the differences." *Hassett v. Altai, Inc. (In re CIS Corp.),* 214 B.R. 108, 118 (Bankr.S.D.N.Y.1997).

The moving party has the burden of demonstrating the absence of any genuine issue of material fact, and all of the inferences to be drawn from the underlying facts must be viewed by the Court in the light most favorable to the party opposing the motion. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Rather, it must present "significant probative evidence" that a genuine issue of fact exists. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no genuine issue of fact for trial and summary judgment is appropriate. *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. *See Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.

2000), *cert. denied,* 540 U.S. 811, 124 S.Ct. 53, 157 L.Ed.2d 24 (2003).

## B. The Plaintiff's Motion for Summary Judgment on Counts One, Three, and Four of the Complaint

The Plaintiff seeks summary judgment on Counts One, Three, and Four of the Complaint. In Count One, the Plaintiff seeks a declaratory judgment that he has been the equitable owner of the Property since October 1999, with a right to cure the prepetition default on the mortgage and/or to redeem the mortgage under a Chapter 13 plan; as well as a declaratory judgment that upon the mortgage being redeemed, a deed should be executed transferring title to the Property to him as the legal owner. In Count Three, the Plaintiff seeks a declaratory judgment that his right, title, and interests in the Property were not extinguished or affected by the Foreclosure Sale held on December 5, 2003. In Count Four, the Plaintiff seeks a declaratory judgment that he has a purchaser's lien against the Property or any surplus monies in the amount of $15,000, corresponding to his down payment on the Contract, plus the value of any improvements that he made to the Property.

The Plaintiff advances several arguments in favor of summary judgment. First, the Plaintiff argues that as a tenant of the Property who did not receive notice of the Foreclosure Action, he holds an equitable right of redemption that was not extinguished by the Foreclosure Sale. Second, the Plaintiff argues that as a contract vendee, and contract vendee in possession, who did not receive notice of the Foreclosure Action, he was the equitable owner of the Property and his right of redemption was not extinguished by the Foreclosure Sale. Third, the Plaintiff argues that based upon the parties' course of conduct and his improvements and investments in the

Property, he was the legal owner of the Property. And finally, the Plaintiff asserts that at a minimum, he has a purchaser's lien on the Property in the amount of his $15,000 down payment on the Contract.

■ Section 541(a)(1) of the Bankruptcy Code provides that a bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Thus, if the Debtor had an equitable ownership interest and right of redemption as of the Petition Date, then those rights became part of his bankruptcy estate. *In re Haynes,* 283 B.R. 147, 155 (Bankr.S.D.N.Y.2002); *see Brown v. Dellinger,* 734 F.2d 119, 123 (2d Cir.1984) (explaining that the phrase "all legal or equitable interests of the debtor in property" used in Section 541 has been given the broadest possible interpretation); *Harsh Inv. Corp. v. Bialac (In re Bialac),* 712 F.2d 426, 430–31 (9th Cir.1983) (explaining that redemption rights are "property of the estate").

■ The Court must look to applicable non-bankruptcy law to determine property rights in the assets of a Debtor's estate. *See Butner v. United States,* 440 U.S. 48, 48–49, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *In re Policy Realty Corp.,* 242 B.R. 121, 128 (S.D.N.Y.1999), *aff'd,* 213 F.3d 626 (2d Cir.2000); *In re Liggett,* 118 B.R. 213, 216 (Bankr.S.D.N.Y.1990); 5 COLLIER ON BANKRUPTCY ¶ 541.05 (15th ed. rev.2004). Here, New York law provides the framework for consideration of these issues.

*1. The Plaintiff's Claims as a Tenant with a Right of Redemption*

Section 1311 of New York's Real Property Actions and Proceedings Law ("RPAPL") provides that "necessary defendants" to a foreclosure action include "[e]very person having an estate or interest in possession, or otherwise, in the property as tenant in fee, for life, by the courtesy, or for years." N.Y. REAL PROP. ACTS. LAW § 1311(1) (1979). Applying RPAPL Section 1311, courts have found that a tenant who is a party to a valid lease must be made a party to a mortgage foreclosure action. *See, e.g., 6820 Ridge Realty, L.L.C. v. Goldman,* 263 A.D.2d 22, 25, 701 N.Y.S.2d 69, 72 (N.Y.App. Div.2d Dep't 1999) ("tenants are clearly necessary parties to a foreclosure action."); *Polish Nat'l Alliance of Brooklyn, U.S.A. v. White Eagle Hall Co.,* 98 A.D.2d 400, 404, 470 N.Y.S.2d 642, 647 (N.Y.App. Div.2d Dep't 1983) ("Necessary parties include ... tenants"); *RTC Mortgage Trust 1995– S/N1 v. Polmar Realty, Inc.,* 1996 WL 689281, at *6 (S.D.N.Y.1996) ("New York law provides that tenants are necessary defendants in mortgage foreclosure actions"); *East New York Sav. Bank v. Austin Mall Assoc.,* 224 A.D.2d 652, 652, 638 N.Y.S.2d 730, 730 (N.Y.App. Div.2d Dep't 1996) (tenants are necessary parties to a foreclosure action pursuant to RPAPL 1311(1)).

■ At the same time, a lease tenant is not considered an indispensable party to a mortgage foreclosure action. *Resolution Trust Corp. v. 53 West 72nd St. Realty Assoc.,* 1992 WL 183741, at *6 (S.D.N.Y. 1992). As a consequence, "[t]he absence of a necessary party in a foreclosure action simply leaves that party's rights unaffected by the judgment of foreclosure and sale." *Polish Nat'l Alliance of Brooklyn, U.S.A.,* 98 A.D.2d at 406, 470 N.Y.S.2d at 648; *Resolution Trust Corp.,* 1992 WL 183741, at *6. Thus, if a tenant who is a necessary defendant is not joined as a party in a mortgage foreclosure action, the resulting foreclosure sale is void as to him or her. *6820 Ridge Realty, L.L.C.,* 263 A.D.2d at 26, 701 N.Y.S.2d at 73. "The rationale for joinder of [tenants and junior lienholders] derives from the underlying objective of foreclosure actions—to extin-

guish the rights of redemption of all those who have a subordinate interest in the property and to vest complete title in the purchaser at the judicial sale." *Polish Nat'l Alliance of Brooklyn, U.S.A.*, 98 A.D.2d at 404, 470 N.Y.S.2d at 647.

 A lease tenant has an equitable right to redeem his or her landlord's mortgage in the event of a foreclosure. *6820 Ridge Realty L.L.C.*, 263 A.D.2d at 28, 701 N.Y.S.2d at 73; *G.B. Seely's Son, Inc. v. Fulton–Edison, Inc.*, 52 A.D.2d 575, 578, 382 N.Y.S.2d 516, 520 (N.Y.App. Div.2d Dep't 1976). This allows the tenant to protect his or her interest upon the default of the mortgagor, and "if [the tenant] can not redeem, he may be very injuriously affected." *Averill v. Taylor*, 8 N.Y. 44, 54 (1853). This right to redeem is derived from the owner because "[t]he mortgagor is bound in equity and good conscience to permit his lessee to do that, which according to his contract, he ought himself to have done." *Averill*, 8 N.Y. at 53. *See G.B. Seely's Son, Inc.*, 52 A.D.2d at 578, 382 N.Y.S.2d at 520. This equitable right of redemption is not extinguished when the mortgagee omits the tenant as a party in a foreclosure action. *6820 Ridge Realty L.L.C.*, 263 A.D.2d at 28, 701 N.Y.S.2d at 73. *See G.B. Seely's Son, Inc.*, 52 A.D.2d at 578, 382 N.Y.S.2d at 520.

 But the protection of a tenant's rights is not uniform or absolute. Courts make distinctions between different types of tenancies, and a month-to-month tenant enjoys fewer rights than a "tenant in fee, for life, by the curtesy, or for years." N.Y. REAL PROP. ACTS. LAW § 1311. *See A.P. Lenox Assoc. v. 585 Lenox Avenue Assoc.*, 194 A.D.2d 380, 380, 598 N.Y.S.2d 264, 265 (N.Y.App. Div. 1st Dep't 1993); *United States v. Bedford Assoc.*, 491 F.Supp. 851, 866 (S.D.N.Y.1980), *rev'd on other grounds*, 657 F.2d 1300, 1318 (2d Cir.1981). New York law does not require that a month-to-month tenant be served with a notice of pendency, summons, or complaint in a mortgage foreclosure action. *A.P. Lenox Assoc.*, 194 A.D.2d at 380, 598 N.Y.S.2d 264; 1 BERGMAN ON NEW YORK MORTGAGE FORECLOSURES § 12.03 (2004). *See Bedford Assoc.*, 491 F.Supp. at 866. Similarly, a month-to-month tenant is not considered a necessary party to a mortgage foreclosure action. *See A.P. Lenox Assoc.*, 194 A.D.2d at 380, 598 N.Y.S.2d at 264; 1 BERGMAN ON NEW YORK MORTGAGE FORECLOSURES § 12.03. And "the interests of a party in possession solely as a statutory month-to-month tenant are also cut off when a prior mortgage on the premises is foreclosed." *Bedford Assoc.*, 491 F.Supp. at 866. This reflects the common-sense distinction between the legal interests of a month-to-month tenant and other types of tenants, and the fact that a tenant other than a month-to-month tenant has a greater legal interest to protect. *See Averill*, 8 N.Y. at 49.

The Plaintiff alleges that he was a tenant of the Property continuously since January 1996. Complaint ¶ 10; Oligbo Aff. ¶ 5; Oligbo Reply Aff. (Reply to Pisciotta Aff.) ¶ 2(c). Accordingly, the Plaintiff argues, he had a right as a tenant to receive notice of the Foreclosure Action and because he did not receive notice, his equitable right of redemption was not affected by the Foreclosure Sale. Plaintiff's S.J. Br. at 3–4.

 Here, the record shows that the Plaintiff resided in the first floor and basement of the Property pursuant to the Lease from January 1996 to December 1999 at a monthly rent of $1,000. Complaint ¶ 10; Oligbo Aff. ¶ 5 and Exh. A (Lease). The record further shows that for a significant portion, and perhaps all, of the time from January 2000 to the present, the Plaintiff has resided in the Property as a month-to-month tenant. *Id.* The record does not establish whether the Plaintiff

occupied the Property when the Foreclosure Action was commenced in December 2002. *See* pp. 628–29, *supra.* But even if he did, it is undisputed that the Lease had terminated by its terms some three years earlier. As a result, the Plaintiff had, at most, the rights of a month-to-month tenant at the time of the Foreclosure Action and Foreclosure Sale.

The Plaintiff argues that tenants generally are entitled to notice of the commencement of a foreclosure action under RPAPL Section 1311. Plaintiff's S.J. Br. at 3–4; *6820 Ridge Realty, L.L.C.,* 263 A.D.2d at 25, 701 N.Y.S.2d at 71; *Polish Nat'l Alliance of Brooklyn, U.S.A.,* 98 A.D.2d at 404, 470 N.Y.S.2d at 647. But a month-to-month tenant does not have the same right to notice as a tenant who is a party to a lease when a foreclosure action is commenced. *See A.P. Lenox Assoc.,* 194 A.D.2d at 380, 598 N.Y.S.2d at 265. Here, the record shows that from January 2000 forward, the Plaintiff had, at most, a month-to-month tenancy, and was not a necessary party to the Foreclosure Action under RPAPL Section 1311. As a result, the Plaintiff's rights as a tenant did not include the right to receive notice of the Foreclosure Action, and the failure to give notice did not give rise to an equitable right of redemption that survived the Foreclosure Sale. *A.P. Lenox Assoc.,* 194 A.D.2d at 380, 598 N.Y.S.2d at 265; N.Y. REAL PROP. ACTS. LAW § 1311.

### 2. The Plaintiff's Claims as a Contract Vendee or Contract Vendee in Possession

RPAPL Section 1311 provides that "necessary defendants" to a mortgage foreclosure action include "[e]very person having any lien or incumbrance upon the real property which is claimed to be subject and subordinate to the lien of the plaintiff." N.Y. REAL PROP. ACTS. LAW § 1311(3). Thus, "RPAPL 1311 codifies the equitable principle that persons holding title to the premises or acquiring any right to or lien on the property subsequent to the mortgage should be made defendants in the foreclosure action." *Polish Nat'l Alliance of Brooklyn, U.S.A.,* 98 A.D.2d at 403, 470 N.Y.S.2d at 646. *See New Falls Corp. v. Board of Managers of the Parkchester North Condo., Inc.,* 10 A.D.3d 574, 576, 782 N.Y.S.2d 425, 427 (N.Y.App. Div. 1st Dep't 2004).

Joining all necessary parties in a foreclosure action benefits both the purchaser at the foreclosure sale and the necessary parties. The joinder of parties holding interests or liens such as title-holders, tenants, holders of subordinate liens or judgments, and contract vendees validates the foreclosure action by extinguishing all rights of redemption and vesting complete title in the purchaser at the foreclosure sale. *Polish Nat'l Alliance of Brooklyn, U.S.A.,* 98 A.D.2d at 403, 470 N.Y.S.2d at 646; *New Falls Corp.,* 10 A.D.3d at 576, 782 N.Y.S.2d at 427. Notice also benefits interested parties because it allows them to redeem before a sale, to bid at the sale, and otherwise to protect their interests. *Polish Nat'l Alliance of Brooklyn, U.S.A.,* 98 A.D.2d at 404, 470 N.Y.S.2d at 647; *New Falls Corp.,* 10 A.D.3d at 576, 782 N.Y.S.2d at 427.

As the New York Court of Appeals has held, "the courts of this state have uniformly recognized the right of a vendee to a lien when he was in possession, or had made improvements, or where special equities intervened." *Elterman v. Hyman,* 192 N.Y. 113, 118, 84 N.E. 937 (1908). The roots of this rule are deep, and reach back to English common law. As the Court of Appeals further observed:

> The doctrine is well established in England where it is sometimes said to have originated as recently as 1855, but it was clearly announced nearly twenty years before the Revolutionary war by a court of which Lord Mansfield as a member.

(*Burgess v. Wheate*, 1 W. Blacks. 123, 150.) ... In 1855 ... the question arose directly and although the vendee was not in possession and there was no special equity in his favor he was held to have a lien both upon principle and authority. (*Wythes v. Lee*, 3 Drewry's Ch. 396, 403.)

*Id.* at 119, 84 N.E. 937.

A contract vendee is a necessary party to a foreclosure action because he or she holds equitable title to the property. *Elterman*, 192 N.Y. at 125, 84 N.E. 937; *Bean v. Walker*, 95 A.D.2d 70, 72, 464 N.Y.S.2d 895, 897 (N.Y.App. Div. 4th Dep't 1983). "[T]he execution of a contract for the purchase of real estate and the making of a part payment gives a contract vendee equitable title to the property and an equitable lien in the amount of the payment." *Polish Nat'l Alliance of Brooklyn, U.S.A.*, 98 A.D.2d at 404–05, 470 N.Y.S.2d at 647. *See Elterman*, 192 N.Y. at 125, 84 N.E. 937 ("The contract and payment in part make him the equitable owner *pro tanto*"); *Carnavalla v. Ferraro*, 281 A.D.2d 443, 443, 722 N.Y.S.2d 47, 48 (N.Y.App. Div.2d Dep't 2001); *Lowenstein v. Reikes*, 140 Misc. 645, 251 N.Y.S. 618 (N.Y. Sup.Ct. Queens Co.1931); WILLIAM H. DANNE, JR. & CHRISTINE M. GIMENO, 78 N.Y. JUR. MORTGAGES AND DEEDS OF TRUST § 589 (2d ed.2003). A contract vendee's equitable title derives from the mortgagor, and "the vendor holds the legal title in trust for the vendee." *Bean*, 95 A.D.2d at 72, 464 N.Y.S.2d at 897. *See Carnavalla*, 281 A.D.2d at 443, 722 N.Y.S.2d at 48.

A contract vendee in possession is similarly considered an equitable owner. *County Trust Co. v. Edmil Constr. Corp.*, 203 Misc. 208, 212, 114 N.Y.S.2d 520, 523 (N.Y. Sup.Ct. Queens Co.1952); *Scheidt v. Supreme Woodworking Co.*, 212 A.D. 179, 180, 208 N.Y.S. 394, 395 (N.Y.App. Div.2d Dep't 1925). "The vendee in possession, for all practical purposes, is the owner of the property with all the rights of an owner subject only to the terms of the contract." *Bean*, 95 A.D.2d at 72, 464 N.Y.S.2d at 897. A contract vendee in possession may hold rights superior to that of a subsequent purchaser without actual notice of the contract vendee's interest even if the contract was not recorded, based "on the theory that possession gives constructive notice of a contract vendee's rights." *Engel v. Tinker Nat'l Bank*, 269 F.Supp. 199, 203 (E.D.N.Y.1967).

As discussed above, the failure to join a necessary party in a mortgage foreclosure action does not require dismissal of the action. *Polish Nat'l Alliance of Brooklyn, U.S.A.*, 98 A.D.2d at 406, 470 N.Y.S.2d at 648. *See* pp. 637–39, *supra*. Instead, the omitted party's rights are unaffected by the judgment of foreclosure and sale. *Polish Nat'l Alliance of Brooklyn, U.S.A.*, 98 A.D.2d at 406, 470 N.Y.S.2d at 648. Courts have found that contract vendees have the right to "redeem the mortgage prior to sale by tendering to the mortgagee the principal and interest due on the mortgage." *Polish Nat'l Alliance of Brooklyn, U.S.A.*, 98 A.D.2d at 405, 470 N.Y.S.2d at 647. *See Barclay's Bus. Credit, Inc. v. Stewart*, 242 A.D.2d 647, 647, 664 N.Y.S.2d 949, 949 (N.Y.App. Div.2d Dep't 1997) ("A contract vendee of premises which are the subject of a mortgage foreclosure has the right to redeem the property before the foreclosure sale."); *Carnavalla*, 281 A.D.2d at 443, 722 N.Y.S.2d at 48 (contract vendee has common-law right to redeem prior to foreclosure sale); WILLIAM H. DANNE, JR. & CHRISTINE M. GIMENO, 78 N.Y. JUR. MORTGAGES AND DEEDS OF TRUST § 409 (2d ed.2003). Thus, if a contract vendee is not made a party to a mortgage foreclosure action, his or her right of redemption survives the foreclosure sale.

The starting point in determining whether the Plaintiff is an equitable owner by virtue of being a contract vendee or contract vendee in possession is the existence of a valid contract when the foreclosure action was commenced. The Plaintiff argues that he and Gomez entered into a valid contract with Louis and Belony, that the Contract was not terminated or abandoned, and therefore, that he had the rights of a contract vendee or a contract vendee in possession when the Foreclosure Action was commenced. Plaintiff's S.J. Br. at 5–7, 10–12; Plaintiff's Reply Mem. at 1–5; Oligbo Aff. ¶¶ 6, 8, 31; Stmt. Pursuant to Rule 7056–1 ¶ 3; Complaint ¶¶ 11, 13, 29, 34. The record shows that the Contract was recorded on March 9, 2001, before the Foreclosure Action was commenced. Oligbo Aff. ¶ 6 and Exh. C (New York City Register Recording and Endorsement Page). The Plaintiff further argues that this gave him a right to redeem the mortgage that was not extinguished by the Foreclosure Sale. Plaintiff's S.J. Br. at 5–7; Complaint ¶¶ 29, 30, 39; Oligbo Aff. ¶¶ 31, 32. Bapteau argues that the Plaintiff has no right to redeem because the Contract was either expired and extinguished or abandoned before the Foreclosure Action was commenced. Bapteau's Opp. Br. at 5–7, 8–9.

*The Existence of a Valid Contract*

 As discussed above, the record reflects that on October 29, 1999, Oligbo and Gomez as purchasers and Louis and Belony as sellers entered into the Contract, which provided for a purchase price of $225,000, and a down payment of $15,000. Complaint ¶ 11; Oligbo Aff. ¶ 6 and Exh. B (Contract). *See* pp. 629–32, *supra.* The record also indicates that the Contract was recorded on March 9, 2001. Oligbo Aff. ¶ 6 and Exh. C (New York City Register Recording and Endorsement Page).

The record indicates that the down payment was made by forty-one postal money orders dated October 29, 1999, and December 20, 1999, totaling $15,000. Oligbo Aff. ¶ 6 and Exh. B (copies of postal money orders); Oligbo Reply Aff., Exh. C (copies of postal money orders). The record also shows that the Plaintiff, Gomez, Louis, and Belony signed the Contract and a related document, the "Disclosure of Information on Lead–Based Paint and/or Lead–Based Paint Hazards," on those same dates. *See* Oligbo Aff. Exh. B (Contract). While the parties dispute whether the down payment was made, the Court finds that the Plaintiff has offered persuasive evidence in support of his assertion that the down payment was made, and Bapteau has failed to come forward with "significant probative evidence" to show the existence of a genuine issue of fact. *See Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Accordingly, the Court concludes that the record establishes that the Plaintiff and Gomez made the down payment and that a valid contract of sale for the Property existed.

Bapteau makes several arguments in support of his position that the Contract was no longer in effect when the Foreclosure Action was commenced. First, Bapteau argues that the Contract expired by operation of New York State's recording statute. Bapteau's Opp. Br. at 5. Next, Bapteau argues that there was no adjournment of the closing date, so the Contract expired by its terms. Bapteau's Opp. Br. at 8–9. Finally, Bapteau argues that the parties abandoned the Contract. Bapteau's Opp. Br. at 5–7, 8–9. The Court considers each of these arguments below.

*Whether the Contract Expired Based upon New York's Recording Statute*

 Section 294 of New York's Real Property Law provides in part:

4. (a) Where an executory contract is duly recorded as provided in this section the right of the purchaser to performance of the contract is en-

forceable against a person who, subsequent to the recording and while the recording is effective as provided in this section, purchases or acquires by exchange the same real property or any part thereof, from the same vendor, his distributees, or devisees . . .

. . .

5. The recording of the executory contract or memorandum shall be effective for the purposes of subdivision four up to and including the thirtieth day after the day fixed by contract for the conveyance of title . . . .

N.Y. REAL PROP. LAW § 294(4)-(5) (1979). By its terms, Section 294 defines the effective period of notice provided by a recorded executory contract, not the effective date of the contract itself, and it addresses the enforcement of an executory contract against subsequent purchasers. *See Teichman v. Marrazzo*, 42 Misc.2d 354, 355-56, 247 N.Y.S.2d 741, 742-43 (N.Y. Sup.Ct. Kings Co.1963); N.Y. REAL PROP. LAW § 294. That is, it defines the time period in which a purchaser may enforce his or her rights under a recorded contract against a subsequent purchaser. It does not determine the validity of the contract itself. *See Teichman*, 42 Misc.2d at 355-56, 247 N.Y.S.2d at 742-43.

■ Bapteau argues that the date fixed by the Contract for the conveyance of title was October 29, 2000, and that under Section 294(5), the Contract expired and was extinguished thirty days later, on November 28, 2000. Bapteau's Opp. Br. at 5; N.Y. REAL PROP. LAW § 294(5). As a result, Bapteau argues, the Contract was not valid as of the commencement of the Foreclosure Action, and the Plaintiff was not a contract vendee as of that date. Bapteau's Opp. Br. at 5.

But this argument misses the mark, because Section 294(5) does not concern the right to enforce a contract, nor does it

override the various grounds on which the stated date for performance may be modified. *See* pp. 642-53, *infra*. Rather, Section 294(5) defines the time period in which a recorded contract may be enforced against a subsequent purchaser. *Teichman*, 42 Misc.2d at 355-56, 247 N.Y.S.2d at 742-43. The last effective date of the notice provided by the recording of a contract does not impact the validity of the contract itself. *Id.* And here, it does not provide a basis for the Court to conclude that the Contract had expired before the Foreclosure Action was commenced. *Id.*

*Whether the Contract Expired Because the Stated Closing Date Was Not Formally Adjourned*

■ New York law provides that "time is not of the essence in a contract for the purchase and sale of realty in the absence of a clear and unequivocal provision making it so." *In re Southold Dev. Corp.*, 134 B.R. 705, 708 (E.D.N.Y.1991). *See also Tarlo v. Robinson*, 118 A.D.2d 561, 565, 499 N.Y.S.2d 174, 177 (N.Y.App. Div.2d Dep't 1986). And time is "never of the essence of a contract for the sale of real property unless the contract specifically so provides or special circumstances surrounding its execution so require." *Tarlo*, 118 A.D.2d at 565, 499 N.Y.S.2d at 177. Language indicating that closing should not occur later than a particular date has been held not to be so "clear and unequivocal so as to render time to be of the essence." *In re Southold Dev. Corp.*, 134 B.R. at 708 (time found to be of the essence not because the contract indicated that closing should occur no later than a particular date but because another contract provision decreed time to be of the essence). *See also O'Connell v. Clear Holding Co.*, 126 A.D.2d 530, 530, 510 N.Y.S.2d 653, 653 (N.Y.App. Div.2d Dep't 1987) (time was not made of the essence by a contract provision stating that closing

would take place "on or before" a certain date).

■■■■■■ Where a contract does not provide that time is of the essence, the parties are "entitled to a reasonable adjournment of the designated closing date without the passage of the law day amounting to an incurable contractual default." *Tarlo,* 118 A.D.2d at 565, 499 N.Y.S.2d at 177. An "indefinite adjournment" occurs when there is no "clear, distinct, and unequivocal notification" from one party to the other fixing "a reasonable time within which the other party may perform and warning that failure to close on that date would result in a default." *Steinberg v. Linzer,* 2002 WL 221104, at *4 (N.Y. Sup.Ct. Suffolk Co. 2002). *See Tarlo,* 118 A.D.2d at 566, 499 N.Y.S.2d at 177; *Hamburger v. Rieselman,* 206 A.D.2d 822, 824, 615 N.Y.S.2d 143, 145 (N.Y.App. Div.3d Dep't 1994). Also, "[w]hen there is an indefinite adjournment, some affirmative act has to be taken by one party before he can claim the other party in default." *Royce v. Rymkevitch,* 29 A.D.2d 1029, 1030, 289 N.Y.S.2d 598, 599 (N.Y.App. Div.3d Dep't 1968). *See also Tarlo,* 118 A.D.2d at 566, 499 N.Y.S.2d 174. The type of affirmative act that must be taken is in the nature of one party setting a performance deadline and informing the other party of the consequences of not performing on that date. *Tarlo,* 118 A.D.2d at 566, 499 N.Y.S.2d at 177. *See also Hamburger,* 206 A.D.2d at 824, 615 N.Y.S.2d at 145.

Bapteau argues that when a contract for the sale of real property does not specify that time is of the essence, a "reasonable adjournment" is allowed but a request for an adjournment and a set closing date are necessary for the adjournment to be effective. Bapteau's Opp. Br. at 8. He argues that the closing date set by the Contract, October 29, 2000, "came and went without adjournment, tender of performance or consistent contractual behavior by either buyers and sellers." *Id.* As a result, he suggests, the parties did not indefinitely adjourn the Contract, so it was extinguished by the time that the Foreclosure Action was commenced and does not provide a basis for the Plaintiff to claim a right to redeem the mortgage. *Id.* at 8–9.

The Plaintiff responds that when a contract does not provide that time is of the essence, either party to the contract is entitled to a reasonable adjournment. Plaintiff's S.J. Br. at 10. Here, the Plaintiff argues, there was a mutual adjournment, and the Contract remained enforceable through the date of his bankruptcy filing, giving the Plaintiff a right to redeem the mortgage. Plaintiff's S.J. Br. at 12.

The Plaintiff further argues that, because the Contract did not provide that time was of the essence, neither party is in default for failure to close because the parties mutually adjourned the closing for an indefinite period. Plaintiff's S.J. Br. at 10–12. The Plaintiff asserts that the parties mutually and indefinitely adjourned the Contract until Louis was released from prison or able to effectuate a closing by appointing a power of attorney. Plaintiff's S.J. Br. at 12. The Plaintiff notes that he attended scheduled closings on the Contract and did not seek the return of his $15,000 down payment, all showing his intent to proceed with the Contract. Plaintiff's Reply Mem. at 3.

■■■■ It is undisputed that the Contract does not contain a "time of the essence" clause. Oligbo Aff., Exh. B (Contract). Clause 15 of the Contract, entitled "Closing Date and Place," appears to state that the "[c]losing shall take place at the office of [sic] 12 months from contract signing at lending institution." *Id. See* n. 2, *supra.* Like the contract in *O'Connell,* the closing provision does not state "on or before," and no other Contract provisions indicate

that time is of the essence. *See O'Connell,* 126 A.D.2d at 530, 510 N.Y.S.2d at 653.

In addition, the record is consistent with an indefinite adjournment of the date to close because there was no "clear, distinct, and unequivocal notification" exchanged between the parties to the Contract indicating that the other side had to perform by a particular date or face the prospect of a default. *Steinberg,* 2002 WL 221104, at *4. *See In re Southold Dev. Corp.,* 134 B.R. at 708; *Royce,* 29 A.D.2d at 1030, 289 N.Y.S.2d at 601; *Tarlo,* 118 A.D.2d at 566, 499 N.Y.S.2d at 177. The record does not show that Louis, Belony, the Plaintiff, or Gomez took affirmative steps to terminate the indefinite adjournment or declare the other parties in default. *See Tarlo,* 118 A.D.2d at 566, 499 N.Y.S.2d at 177. Rather, the record shows that the parties to the Contract indicated their intent to proceed with the Plaintiff's acquisition of the Property in several ways.

For example, as to Louis and Belony, the sellers, the record shows that while Louis was incarcerated, he corresponded with the Plaintiff (using the name Flaubert Blas) in 2003 and asked the Plaintiff to continue as the "caretaker" of the Property. Oligbo Aff. ¶ 12 and Exh. F (first letter from Flaubert Blas to the Plaintiff). Louis also asked the Plaintiff to be patient while Louis arrived at a way to close on the Contract through Behrman, Belony, or Bapteau, and noted that the "amount of the contract remains $225,000." *Id. See* pp. 630–31 and n. 4, *supra.*

The record shows that Belony, the other seller, corresponded with Henry Louis of Cullen & Dykman in 2003 to authorize the release of information on the Greenpoint mortgage to a prospective lender to the Plaintiff. Oligbo Aff. ¶ 12 and Exh. F (letter dated April 29, 2003, from Belony to Henry Louis of Cullen & Dykman). The record further reflects that in November 2003, Belony was scheduled to attend a closing with the Plaintiff's mortgage broker and the Plaintiff. Oligbo Aff. ¶ 18. This indicates that Louis and Belony did not view the stated closing date as essential to the transaction, and did not give "clear, distinct, and unequivocal notification" that the failure to close by a date certain would lead to a default. *Steinberg,* 2002 WL 221104, at *4. *See In re Southold Dev. Corp.,* 134 B.R. at 708; *Royce,* 29 A.D.2d at 1030, 289 N.Y.S.2d at 602–03; *Tarlo,* 118 A.D.2d at 566, 499 N.Y.S.2d at 177.

As to the Plaintiff and Gomez, the buyers, the record similarly reflects their continuing intent to close on the Contract. The record shows that the Plaintiff secured a commitment for mortgage financing to purchase the Property in May 2001, in the amount of $202,500. Oligbo Aff. ¶ 10 and Exh. E–1 (loan commitment document in the name of Roberto Oligbo dated May 11, 2001, from Fairmont Funding, Ltd.). After that commitment expired in June 2001, the Plaintiff, through his cousin Salako, secured a second commitment for mortgage financing to purchase and make improvements on the Property and for other expenses in November 2003 in the amount of $300,000. Oligbo Aff. ¶ 10 and Exh. E–2 (loan commitment document in the name of Salako dated November 5, 2003, from Fremont Investment & Loan); Oligbo Reply Aff. (Reply to Disputed Facts Stmt.) ¶¶ 7, 25. The record also shows that the Plaintiff attended closings that were scheduled in November and December 2003, and that mortgage financing was available to close on those dates. Oligbo Aff. ¶ 18; Oligbo Reply Aff. (Reply to Disputed Facts Stmt.) ¶ 6 and Exh. D (letter dated October 13, 2004, from Parziale, Carroll & Scalia, L.L.C. to Plaintiff's counsel). The record further indicates that the Plaintiff did not seek the return of his $15,000 down payment.

In addition, the record shows that the Plaintiff took steps to maintain the Property that are consistent with an intent to purchase the Property. The Plaintiff made payments toward the mortgage and paid the utilities. Complaint ¶ 14; Oligbo Aff. ¶¶ 9, 13, 16, 32, Exh. D-1 (Greenpoint mortgage statements), Exh. D-2 (photographs of roof repairs), Exh. D-3 (receipts for landscaping and other home maintenance), and Exh. D-5 (Keyspan payment coupons); Oligbo Reply Aff. (Reply to Disputed Facts Stmt.) ¶¶ 5, 27, Exh. A (Keyspan bills), and Exh. B (ConEdison bills); Oligbo Reply Aff. (Reply to Undisputed Facts Stmt.) ¶¶ 11, 17. When the mortgage went into foreclosure or utility bill payments were in question, the Plaintiff tried to cure the defaults and prevent the Property from going into foreclosure. Oligbo Aff. ¶¶ 13, 14, 16; Oligbo Reply Aff. (Reply to Disputed Facts Stmt.) ¶¶ 5, 27. The Plaintiff also made some expenditures toward procuring a new boiler and made other repairs and improvements to the Property. Oligbo Reply Aff. (Reply to Undisputed Facts Stmt.) ¶ 17 and Exh. E (cost estimate for improvements to the Property). And while Pisciotta, a tenant at the Property, states that she complained to the Plaintiff about problems with her apartment, including the lack of cold water in the bathroom, dripping water in the kitchen sink, cockroaches, and peeling plaster, this supports, rather than undermines, the Plaintiff's assertion that he was viewed as the person responsible for conditions at the Property. See Pisciotta Aff. ¶¶ 14, 15, 19; Oligbo Reply Aff. (Reply to Pisciotta Aff.) ¶¶ 2(a), 2(b), 2(d)-(f).

Based upon the entire record, the Court concludes that the Contract did not provide that time was of the essence, and therefore, the Plaintiff was entitled to a reasonable adjournment of the closing date. The record further shows that there was no "clear, distinct, and unequivocal notification" from Louis and Belony to the Plaintiff, so that the Plaintiff's time to perform the Contract was adjourned indefinitely. Finally, the record shows that Louis and Belony did not set a performance deadline or otherwise take an affirmative act that would terminate the indefinite adjournment. As a result, the Court concludes that the Contract did not expire because the stated closing date was not formally adjourned, and further, that the Plaintiff's time to perform the Contract was adjourned indefinitely and that adjournment was not terminated.

*Whether the Contract Was Abandoned*

 Abandonment of a contract by conduct of the parties requires that the conduct be "mutual, positive, unequivocal, and inconsistent with the intent to be bound." *Benson v. RMJ Sec. Corp.*, 683 F.Supp. 359, 373 (S.D.N.Y.1988). *See Armour & Co. v. Celic*, 294 F.2d 432, 437 (2d Cir.1961); *Rosiny v. Schmidt*, 185 A.D.2d 727, 732, 587 N.Y.S.2d 929, 932 (N.Y.App. Div. 1st Dep't 1992). That is, abandonment of a contract cannot be achieved unilaterally:

> [A]bandonment requires mutual assent of the parties. To establish abandonment the evidence must be inconsistent with the continuing intention on the part of both parties to do business under the consignment agreement, and point positively and unequivocally to an intention on the part of both parties to abandon it.

*Armour & Co.*, 294 F.2d at 437.

 Bapteau advances several arguments, including some that are inconsistent, in support of his assertion that the Contract was abandoned by the parties. He asserts that the Contract was invalid because it was abandoned as a result of the parties' actions. Bapteau's Opp. Br. at 5-6. He claims, but does not offer persuasive evidence, that Salako replaced the Plaintiff as the contract vendee, with new transaction terms. Disputed Facts Stmt.

¶ 7; Bapteau's Opp. Br. at 9. Bapteau also claims, but does not offer persuasive evidence, that no closings were scheduled. Disputed Facts Stmt. ¶¶ 22–24. He asserts that the Plaintiff has offered no proof of Louis' incarceration, but provides a ledger from the New York State Department of Correctional Services Inmate Locator indicating that for much of 2003, Louis was incarcerated. Disputed Facts Stmt. ¶ 8; Undisputed Facts Stmt., Exh. F (Department of Corrections Inmate Information) Bapteau also argues that a closing could have occurred despite Louis' incarceration. Disputed Facts Stmt. ¶ 8.

The record shows that the parties to the Contract demonstrated an intent to proceed with the Contract, and not to abandon it, in several ways. The Contract was recorded on March 9, 2001. Oligbo Aff. ¶ 6 and Exh. C (New York City Register Recording and Endorsement Page). The Plaintiff, either directly or through his cousin Salako, obtained mortgage financing to purchase the Property in May 2001 and again in November 2003. Oligbo Aff. ¶ 10, Exh. E–1 (loan commitment document in the name of Roberto Oligbo dated May 11, 2001, from Fairmont Funding, Ltd.), and Exh. E–2 (loan commitment document in the name of Salako dated November 5, 2003, from Fremont Investment & Loan); Oligbo Reply Aff. (Reply to Disputed Facts Stmt.) ¶¶ 7, 25. Closings were scheduled to occur in November and December 2003, and mortgage funds were available. Oligbo Aff. ¶ 18; Oligbo Reply Aff. (Reply to Disputed Facts Stmt.) ¶ 6 and Exh. D (letter dated October 13, 2004, from Parziale, Carroll & Scalia, L.L.C. to Plaintiff's counsel). Louis did not attend and did not provide a power of attorney, so the transaction did not close. Oligbo Aff. ¶ 11; Oligbo Reply Aff. (Reply to Disputed Facts Stmt.) ¶¶ 8, 9. But even though the transaction did not close, the Plaintiff did not seek the return of the $15,000 down payment. Oligbo Aff. ¶ 11; Plaintiff's Reply Mem. at 3.

The record also shows that Louis and Belony demonstrated an intent to proceed with the Contract by their communications with the Plaintiff. As described above, while he was incarcerated, Louis corresponded with the Plaintiff, asking him to be the "caretaker" of the Property and to be patient while he arrived at a way to close on the Contract; and noting that the purchase price remained at $225,000. Oligbo Aff. ¶ 12 and Exh. F (first letter from Flaubert Blas to the Plaintiff). The record also shows that the Plaintiff visited Louis while he was incarcerated, and Louis indicated an intent to sell the Property to him. Oligbo Aff. ¶ 12; Oligbo Reply Aff. (Reply to Disputed Facts Stmt.) ¶ 2. Belony corresponded with Henry Louis of Cullen & Dykman in 2003 in connection with the release of information on the Greenpoint mortgage. Oligbo Aff. ¶ 12 and Exh. F (letter dated April 29, 2003, from Belony to Henry Louis of Cullen & Dykman). Finally, Belony was scheduled to attend a closing in November 2003. Oligbo Aff. ¶ 18.

The record further shows that the Plaintiff demonstrated an intent to proceed with the Contract by his investment in and maintenance of the Property. As described above, the Plaintiff made payments toward the mortgage and paid the utilities. Complaint ¶ 14; Oligbo Aff. ¶¶ 9, 16, 32, Exh. D–1 (Greenpoint mortgage statements), Exh. D–2 (photographs of roof repairs), Exh. D–3 (receipts for landscaping and other home maintenance), and Exh. D–5 (Keyspan payment coupons); Oligbo Reply Aff. (Reply to Disputed Facts Stmt.) ¶¶ 5, 27, Exh. A (Keyspan bills), and Exh. B (ConEdison bills); Oligbo Reply Aff. (Reply to Undisputed Facts Stmt.) ¶¶ 11, 17. When problems arose with the mortgage or utilities, he took steps to address them. Oligbo Aff. ¶ 13; Oligbo Reply Aff.

(Reply to Disputed Facts Stmt.) ¶¶ 5, 14; Oligbo Reply Aff. (Reply to Pisciotta Aff.) ¶¶ 2(a), 2(g), 2(h). The Plaintiff also made repairs and improvements to the Property, including making expenditures toward procuring a new boiler. Oligbo Reply Aff. (Reply to Undisputed Facts Stmt.) ¶ 17 and Exh. E (cost estimate for improvements to the Property). As the Plaintiff observes, these actions indicate his investment in the Property with the belief that the Property would eventually belong to him. *See* Oligbo Reply Aff. (Reply to Pisciotta Aff.) ¶ 2(c).

Based upon the entire record, the Court concludes that the record does not show that the parties to the Contract abandoned it by conduct that was "mutual, positive, unequivocal, and inconsistent with the intent to be bound." *Benson*, 683 F.Supp. at 373. The record establishes that the Plaintiff took steps to arrange for a closing, for financing, and to invest in and maintain the Property with the intent that he would acquire it pursuant to the Contract. The record also establishes that Louis and Belony took steps to communicate with the Plaintiff and others in connection with the Plaintiff's efforts to arrange a closing.

■ In conclusion, the Court finds that the Plaintiff was a party to a valid Contract to purchase the Property; that the Contract did not expire due to New York's recording statute or a "time of the essence" clause; that the date for performance of the Contract was indefinitely adjourned; and finally, that the Contract was not abandoned. As a result, the Contract remained in effect at the time of the Foreclosure Action, and the Plaintiff, as a contract vendee, has the rights flowing from his equitable interest in the Property. These include the right to redeem the mortgage before a foreclosure sale, and that right was not extinguished here be-cause the Plaintiff did not receive notice of the Foreclosure Action.

3. *The Plaintiff's Claims of Legal Title to the Property Based upon the Parties' Conduct*

Some courts have recognized that under appropriate circumstances, a court may award legal title to property to someone other than the record titleholder based upon the conduct of the parties. Citing decisions of courts both in and outside of New York, the Plaintiff asserts that "where property is treated as an asset of an entity, based upon the intentions of the parties, and their course of conduct, a Court may deem the asset to be owned by that entity by operation of law, despite the fact that title is held in a different name," and asks the Court to declare him to be the legal owner of the Property. Plaintiff's S.J. Br. at 7–8.

In *Walwyn v. United States*, 51 F.Supp.2d 320, 322 (E.D.N.Y.1999), cited by the Plaintiff, the court found that relatives of a delinquent taxpayer and title holder of a property to be the legal owners. Plaintiff's S.J. Br. at 8. The property was purchased in the name of the delinquent taxpayer as a "straw purchaser" at an auction conducted by New York City. *Walwyn*, 51 F.Supp.2d at 321. But the relatives assumed all of the responsibilities and obligations of ownership from the outset, including supplying the purchase money for the property, making the mortgage and tax payments, performing costly restoration work, and occupying the property as their home. *Id.* The court found that the relatives were intended from the outset to be the legal owners of the property, and that title was held in the name of another solely to satisfy the income criteria of New York City. *Id.* at 320–21. Neither New York City nor the delinquent taxpayer ob-

jected to title being assumed by the relatives. *Id.*

In *In re LeMons,* cited by the Plaintiff, the court found that a debtor who made the down payment and loan payments on a vehicle, was listed as the insured on an insurance policy, and was in possession of the vehicle was the legal owner even though title to the vehicle was held in the debtor's father name. *In re LeMons,* 1997 WL 33475069, at *2 (Bankr.C.D.Ill.1997). *See* Plaintiff's S.J. Br. at 8. The court relied on an Illinois statute that allowed the presumption of ownership arising from a certificate of title to be rebutted by evidence of actual ownership. *In re LeMons,* 1997 WL 33475069, at *2. Similarly, in *In re B & P Distributors, Inc.,* also cited by the Plaintiff, the court found that the title holder of a vehicle did not have legal ownership, but there too, the court relied on a state statute providing that a certificate of title was not the sole determinant of ownership. *Zimmerman v. Plaksin (In re B & P Distrib., Inc.),* 1 B.R. 426, 427 (Bankr.E.D.Pa.1979). *See* Plaintiff's S.J. Br. at 8.

 Here, the Plaintiff argues that he made improvements on the Property with Louis' and Belony's consent and encouragement. The record shows that the Plaintiff served as the "caretaker" of the Property. Oligbo Aff., Exh. A (Lease Rider) and Exh. F (letter from Flaubert Blas to the Plaintiff). The record also reflects that the Plaintiff maintained and made substantial repairs to the Property. Oligbo Aff., Exh. D–2 (photographs of roof repairs) and Exh. D–3 (receipts for landscaping and other home maintenance). The record also indicates that the Plaintiff made payments toward the mortgage and utilities. Oligbo Aff., Exh. D–1 (Greenpoint mortgage statements; Federal Express mailing labels; United States Postal Service mailing labels) and Exh. D–5 (Keyspan payment coupons).

Bapteau disputes that the Plaintiff maintained the Property in good repair. Pisciotta Aff. ¶¶ 14, 19, 20. He also disputes that the Plaintiff made all of the payments on the utilities and the mortgage. Disputed Facts Stmt. ¶¶ 5 (utilities), 11 (mortgage).

Unlike *Walwyn,* this case does not present a situation where legal title was taken in another's name on a consensual basis to facilitate an acquisition. *Walwyn,* 51 F.Supp.2d at 320. And in *In re LeMons and In re B & P Distributors, Inc.,* the courts relied on state statutes that provided a basis to rebut the presumption of ownership by the title holder of personal property. *In re LeMons,* 1997 WL 33475069, at *2; *In re B & P Distrib., Inc.,* 1 B.R. at 427. But the Plaintiff has identified no such New York statute governing the ownership of real property. Based upon the entire record, the Court finds that the record does not show that the Plaintiff has established that he is entitled to be declared the legal owner of the Property based upon the parties' conduct.

### 4. The Plaintiff's Claim to a Purchaser's Lien on the Property

 The New York Court of Appeals held long ago that "a vendee of land, under an executory contract for the purchase thereof, has a lien on the land for the amount paid pursuant to the contract, although not in possession and with no special equity." *Elterman,* 192 N.Y. at 124, 84 N.E. 937. This lien is on the land itself, and does not provide rights against the seller, because the contract vendee's down payment is based upon his or her faith in the value of the land, not the creditworthiness of the seller. *Harding v. Burke,* 205 A.D. 597, 599, 200 N.Y.S. 144, 145 (N.Y.App. Div. 1st Dep't 1923) (applying *Elterman,* 192 N.Y. at 124, 84 N.E. 937). Because "part payment creates par-

tial ownership, the vendee has an interest in land itself to the extent of the payments made thereon." *Elterman,* 192 N.Y. at 125, 84 N.E. 937. The lien derives from the "trust under which the vendor, as the legal owner, holds the land for the vendee, the equitable owner." *Id.* at 126, 84 N.E. 937. A contract vendee's right to a lien on the property to the extent of payments made extends to the value of any improvements made to the land. *Gibert v. Peteler,* 38 N.Y. 165, 170 (1868). *See Elterman,* 192 N.Y. at 126, 84 N.E. 937.

 The Plaintiff argues that he has a lien on the Property in the amount of his $15,000 down payment. Plaintiff's S.J. Br at 13–14. Bapteau responds that the Plaintiff did not make the $15,000 down payment, has not produced a cancelled check for $15,000, and engaged in "money laundering." Disputed Facts Stmt. ¶ 3, Undisputed Facts Stmt. ¶ 20; November 30, 2004, Hearing Record, Tr. at 26.

As discussed above, the Court finds that the Plaintiff has offered persuasive evidence that the down payment was made, and Bapteau has not come forward with "significant probative evidence" to contradict the Plaintiff's showing. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. *See also* p. 641, *supra.* Accordingly, the Court concludes that the record establishes that the Plaintiff has a purchaser's lien on the Property in the amount of the down payment of $15,000.

*C. The Plaintiff's Motion for a Default Judgment*

The Plaintiff seeks a default judgment against Gomez, Louis, Belony, and Pisciotta (the "Defaulting Defendants") on all counts of the Complaint, on grounds that they have not answered the Complaint or appeared to oppose this Motion. Oligbo Aff. ¶¶ 2, 33–36; Plaintiff's S.J. Br. at 18.

 But the failure of these defendants to respond to the Complaint or to this Motion does not, standing alone, entitle the Plaintiff to summary judgment. At the outset, the Court must determine "'whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law.'" *Smith v. Household Fin. Realty Corp. of N.Y. (In re Smith),* 262 B.R. 594, 597 (Bankr.E.D.N.Y.2001) (quoting CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE: CIVIL § 2688 at 280–81, 282 (1998)). Next, the court must "[accept] as true all of the factual allegations of the complaint, except those relating to damages," and draw "all reasonable inferences from the evidence offered." *Au Bon Pain Corp. v. Artect, Inc.,* 653 F.2d 61, 65 (2d Cir.1981).

 Counts One, Three, and Four seek declaratory judgments concerning the Plaintiff's rights in the Property. To the extent that any of the Defaulting Defendants may have an interest in the same Property, it appears that these Counts may state a "legitimate cause of action" as to them. And accepting all of the Plaintiff's allegations as true, and drawing all reasonable inferences from the evidence offered, there is a basis for declaratory relief. Accordingly, and in the absence of any opposition from the Defaulting Defendants, the Court finds that the Plaintiff is entitled to a default judgment against the Defaulting Defendants on Counts One, Three, and Four of the Complaint.

By contrast, Counts Two and Five seek relief only against Bapteau. As a result, these Counts do not provide a basis for relief, or state a "legitimate cause of action," against the Defaulting Defendants. Accordingly, the Court finds that the Plaintiff is not entitled to a default judgment against the Defaulting Defendants on Counts Two and Five of the Complaint.

## D. Bapteau's Cross–Motion for Summary Judgment

Bapteau seeks summary judgment against the Plaintiff by cross-motion on substantially the same grounds that he opposes the Motion. The moving party bears the burden of showing the absence of any genuine issue of material fact, and all of the inferences to be drawn from the underlying facts must be viewed by the Court in the light most favorable to the party opposing the motion. *See Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. *See also* pp. 636–37, *supra.* Here, Bapteau has not submitted evidence sufficient to meet this burden. And indeed, at the November 30, 2004, hearing, Bapteau's counsel questioned whether the case was appropriate for summary judgment for either side. November 30, 2004, Hearing Record, Tr. at 38. For the reasons described above, and based upon the entire record, the Court finds that Bapteau has not shown that he is entitled to summary judgment on any of the Plaintiff's claims.

## E. Bapteau's Motion for Relief from the Automatic Stay. or in the Alternative, for Adequate Protection

■■■■■ Bapteau seeks relief from the automatic stay, or in the alternative, adequate protection, with respect to his interest in the Property under Sections 362(d)(1) and (d)(2) of the Bankruptcy Code. 11 U.S.C. §§ 362(d)(1), (d)(2); Bapteau's Lift Stay Br. at 2–3. Bapteau urges that relief from the automatic stay is warranted because the Property is declining in value and the Plaintiff has not offered adequate protection payments. Bapteau's Lift Stay Br. at 2. *See* 11 U.S.C. § 362(d)(1). Bapteau also argues that the Plaintiff has no equity in the Property, and that it is not necessary to an effective reorganization. Bapteau's Lift Stay Br. at 3. *See* 11 U.S.C. § 362(d)(2). The automatic stay is a fundamental debtor protection designed to promote equal treatment among creditors and to provide the debtor with a breathing spell from the financial pressures which drove him or her into bankruptcy: *Eastern Refractories Co. v. Forty Eight Insulations Inc.,* 157 F.3d 169, 172 (2d Cir.1998). Notwithstanding this statutory protection, the court may modify the automatic stay for cause, including lack of adequate protection. 11 U.S.C. § 362(d)(1). The court may also modify the automatic stay where the debtor does not have any equity in the property and the property is not necessary to an effective reorganization. 11 U.S.C. § 362(d)(2).

Bapteau argues that he is entitled to relief from the automatic stay or adequate protection under Section 362(d)(1) because the Plaintiff has not made adequate protection payments. Bapteau's Lift Stay Br. at 2. He cites *In re de Kleinman,* 136 B.R. 74 (Bankr.S.D.N.Y.1992), where the court found that "if the Debtor declines to offer adequate protection payments to [a secured creditor] . . . that would constitute cause to lift the automatic stay under Bankruptcy Code § 362(d)(1)." *In re de Kleinman,* 136 B.R. at 78. *See* Bapteau's Lift Stay Br. at 2. Bapteau also asserts that "the property has been in continuing disrepair under debtor['s] stewardship for years," and argues that the failure to make adequate protection payments when property is declining in value is a "classic basis for granting relief from stay." Bapteau's Lift Stay Br. at 2. *See In re Kaplan Breslaw Ash, LLC,* 264 B.R. 309, 333 (Bankr. S.D.N.Y.2001).

Bapteau asserts that he is entitled to relief under Section 362(d)(2) because "the [Plaintiff] occupies the property payment free" and "has no equity in the property, nor is the property necessary to an effective reorganization." Bapteau's Lift Stay Br. at 3. Bapteau notes that the grounds for relief from the automatic stay under

Sections 362(d)(1) and (d)(2) are in the alternative, and that relief must be granted if he shows either that his interest is not adequately protected or that the Plaintiff lacks equity in the Property and it is not necessary for an effective reorganization. *Id. See In re Elmira Litho, Inc.*, 174 B.R. 892, 900 (Bankr.S.D.N.Y.1994).

The Plaintiff responds that Bapteau is not entitled to relief from the automatic stay or adequate protection payments under Section 362(d)(1) because this Section protects a secured creditor against a decline in the value of its collateral from the time that the bankruptcy case is commenced to the time that a plan is confirmed. Plaintiff's Reply Mem. at 6. The Plaintiff urges that here, the value of the Property is not declining, so there is no basis for relief. *Id.* at 6–7 (citing cases). Rather, the Plaintiff states, he has maintained the Property, including undertaking both routine maintenance and more substantial repairs and construction, and its value has increased. *Id.* at 7. The Plaintiff also argues that Bapteau's interest in the Property is protected by a substantial equity cushion. *Id.* (citing cases).

The Plaintiff further responds that Bapteau is not entitled to relief from the automatic stay under Section 362(d)(2) because Bapteau has not met his burden to show that the Plaintiff has no equity in the Property. *Id.* (citing cases). *See* 11 U.S.C. § 362(g). In addition, the Plaintiff states that the Property is necessary to an effective reorganization. Plaintiff's Reply Mem. at 8.

 Courts have broad discretion in determining whether to terminate, annul, modify, or condition the automatic stay. *See, e.g., Capital Communications Fed. Credit Union v. Boodrow*, 197 B.R. 409, 412–13 (N.D.N.Y.1996), *aff'd*, 126 F.3d 43 (2d Cir.1997), *cert. denied*, 522 U.S. 1117, 118 S.Ct. 1055, 140 L.Ed.2d 118 (1998). "In general, ... there must be a showing that continuation will cause some affirmative harm to the secured creditor." *Id.*, 197 B.R. at 413.

Section 362(d)(1) directs that relief from the automatic stay shall be granted for "cause, including the lack of adequate protection of an interest in property." 11 U.S.C. § 362(d)(1). Many courts have concluded that a secured creditor is adequately protected where the record does not show that the property is declining in value. *See, e.g., LNC Invs., Inc. v. First Fid. Bank*, 247 B.R. 38, 50 (S.D.N.Y.2000); *In re Howery*, 275 B.R. 852, 854 (Bankr. S.D.Ohio 2002); *In re Adams*, 218 B.R. 597, 602–03 (Bankr.D.Kan.1998); *In re Swansea Consol. Res., Inc.*, 127 B.R. 1, 3 (Bankr.D.R.I.1991). Courts have similarly held that a secured creditor is adequately protected where the value of the property is significantly more than the amount of the secured creditor's claim—that is, that an equity cushion adequately protects the secured creditor's interest. *See, e.g., Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396, 1400 (9th Cir.1984); *In re Novak*, 103 B.R. 403, 411–12 (Bankr.E.D.N.Y. 1989); *In re Fortune Smooth (U.S.) Ltd.*, 1993 WL 261478, at *6 (Bankr.S.D.N.Y. 1993); *Sanders v. Tucker (In re Tucker)*, 5 B.R. 180, 182 (Bankr.S.D.N.Y.1980).

Section 361 of the Bankruptcy Code provides examples of what may constitute adequate protection, including "periodic cash payments," "additional or replacement liens," or other compensation that is the "indubitable equivalent" of the creditor's interest. 11 U.S.C. § 361. As one court has observed, "[t]here is no precise definition of the term 'adequate protection' as used in the [Bankruptcy] Code." *Marble Sav. Bank v. Johnston (In re Johnston)*, 29 B.R. 106, 108 (Bankr.D.Vt.1983). And many courts agree that "a Landlord's right to timely payment of postpetition rent constitutes an interest in property entitled to

adequate protection." *In re P.J. Clarke's Rest. Corp.*, 265 B.R. 392, 404 (Bankr. S.D.N.Y.2001). *See, e.g., In re Eclair Bakery Ltd.*, 255 B.R. 121, 136 (Bankr. S.D.N.Y.2000); *In re Ernst Home Center, Inc.*, 209 B.R. 955, 966–67 (Bankr. W.D.Wash.1997).

■ Here, the record shows that Bapteau is the legal owner of the Property. Complaint ¶ 5; Oligbo Aff. ¶ 22; Undisputed Facts Stmt. ¶ 5; November 30, 2004, Hearing Record, Tr. at 34. *See* Plaintiff's S.J. Br. at 3. As a result, his interest in the Property is different than that of a secured creditor. The record also shows that the Plaintiff has not made postpetition payments, in the form of monthly rent, use and occupancy, or mortgage payments, to Bapteau. *See* Undisputed Facts Stmt. ¶ 17; Oligbo Reply Aff. (Reply to Undisputed Facts Stmt.) ¶ 17. *See also* Bapteau's Lift Stay Br. at 2. The record further shows that the Plaintiff has incurred expenses in connection with maintaining the Property. *See, e.g.,* Oligbo Aff. ¶ 9 and Exh. D–2 (photographs of roof repairs); Oligbo Reply Aff. (Reply to Pisciotta Aff.) ¶ 2(d); Oligbo Reply Aff. (Reply to Undisputed Facts Stmt.) ¶ 17; Oligbo Reply Aff., Exh. F–2 (bills and payments for landscaping). And the record does not establish that the value of the Property is declining. *See* Oligbo Reply Aff. (Reply to Pisciotta Aff.) ¶ 2(d); Oligbo Reply Aff. (Reply to Undisputed Facts Stmt.) ¶ 17 and Exh. E (cost estimate for improvements to the Property); Oligbo Reply Aff., Exh. F–2 (bills and

payments for landscaping); Plaintiff's Reply Mem. at 7. Finally, the Plaintiff's bankruptcy petition states, "[c]ommencing December co-tenant at premises paid $515/ month directly to new owner, which is to be credited toward monthly 'mortgage' payment owed by debtor. Therefore, the debtor proposes to pay the difference of $1,000 per month." Petition, Schedule I.[5]

Taking all of these circumstances together, the Court concludes that under Section 362(d)(1), Bapteau has shown that he is entitled to adequate protection of his ownership interest in the Property, in the form of monthly cash payments, for so long as he remains the legal owner of the Property. The Court further concludes that the appropriate amount for such payments is $1,000 per month, exclusive of the monthly rent payment made by Pisciotta as a tenant of the Property.

■ Section 362(d)(2) provides that relief from the automatic stay shall be granted if the debtor does not have equity in the property and the property is not necessary for an effective reorganization. 11 U.S.C. § 362(d)(2). Both elements must be satisfied for relief from the stay to issue. *See Pegasus Agency, Inc. v. Grammatikakis (In re Pegasus Agency, Inc.)*, 101 F.3d 882, 886 (2d Cir.1996). Thus, if either the movant fails to show that the debtor has no equity, or the debtor shows that the property at issue is necessary for an effective reorganization, then relief from the

---

5. The Debtor is making payments of $500 per month to the Chapter 13 Trustee pursuant to this Court's March 1, 2004, Order, pending the determination of this Motion. *See* March 1, 2004, Order, Case No. 03–26161, Docket Entry 14; November 30, 2004, Hearing Record, Tr. at 18. The Debtor also states that he is paying utility bills and other costs associated with operating the Property. November 30, 2004, Hearing Record, Tr. at 18; Oligbo Aff. ¶ 9, Exh. D–1 (Greenpoint mortgage state-

ments; Federal Express mailing labels; United States Postal Service mailing labels), Exh. D–2 (photographs of roof repairs), Exh. D–3 (receipts for landscaping and other home maintenance), and Exh. D–5 (Keyspan payment coupons). The Plaintiff does not dispute that he is not making monthly rent payments or forwarding Pisciotta's rent payments to Bapteau. November 30, 2004, Hearing Record, Tr. at 18, 22.

automatic stay under Section 362(d)(2) must be denied. *Id.*

 Here, the record shows that the Plaintiff has equity in the Property. As discussed above, the Court has concluded that the Plaintiff, as a contract vendee, has the rights flowing from his equitable ownership of the Property, including the right to redeem the mortgage before a foreclosure sale, which was not extinguished because the Plaintiff did not receive notice of the Foreclosure Action. *See* pp. 639–47, *supra.* The Court also has concluded that the Plaintiff has a purchaser's lien on the property in the amount of his down payment of $15,000. *See* pp. 648–49, *supra.*

In addition, the record shows that the Property is necessary for an effective reorganization. The record shows that the Plaintiff and members of his family presently reside at the Property. Oligbo Aff. ¶¶ 5; Undisputed Facts Stmt. ¶ 13; Pisciotta Aff. ¶¶ 25–27. The Plaintiff's proposed Chapter 13 plan provides for completing the purchase of the Property through the payoff and redemption of the mortgage debt upon the completion of this Adversary Proceeding as well as the payment in full of all allowed unsecured claims. Docket Entry 7 (Chapter 13 Plan).

Based on the entire record, the Court concludes that Bapteau is not entitled to relief from the automatic stay under Section 362(d)(2), because Bapteau has not shown that the Plaintiff does not have equity in the Property, and because the Plaintiff has shown that the Property is necessary for an effective reorganization.

#### *Conclusion*

The Plaintiff's motion for summary judgment against Bapteau is granted to the extent that the Court concludes that the Plaintiff is entitled to a declaratory judgment that he has a right to redeem the mortgage on the Property and that

upon the mortgage being redeemed, a deed should be executed transferring title to the Property to him; a declaratory judgment that his interest in the Property was not affected by the Foreclosure Sale; and a declaratory judgment that he has a purchaser's lien on the Property in the amount of $15,000; and is otherwise denied without prejudice.

The Plaintiff's motion for default judgment against Gomez, Louis, Belony, and Pisciotta is granted as to Counts One, Three, and Four of the Complaint, and is otherwise denied without prejudice as to Counts Two and Five of the Complaint.

Bapteau's cross-motion for summary judgment against the Plaintiff is denied without prejudice.

Bapteau's motion for relief from the automatic stay is granted to the extent that Bapteau is entitled to adequate protection of his interest in the Property in the form of monthly cash payments in the amount of $1,000 for so long as he remains the legal owner of the Property, and is otherwise denied without prejudice.

The Plaintiff is directed to settle an order in accordance with this Memorandum Decision on ten days' notice.

#### *ORDER GRANTING IN PART MOTION FOR SUMMARY JUDGMENT, GRANTING IN PART MOTION FOR DEFAULT JUDGMENT, DENYING CROSS–MOTION FOR SUMMARY JUDGMENT, AND GRANTING IN PART MOTION FOR RELIEF FROM THE AUTOMATIC STAY*

WHEREAS, the plaintiff Roberto Oligbo (the "Plaintiff"), a Chapter 13 debtor, commenced an adversary proceeding seeking as Count One, a declaratory judgment that he has been the equitable owner of the premises known as 122–14 135th

Avenue, Jamaica, New York (the "Property") since October, 1999 with a right to cure the pre-petition default on the then-existing mortgage (the "Mortgage"), and/or to redeem the Mortgage under a Chapter 13 Plan, and that upon the Mortgage being redeemed, a deed should be executed transferring title to the Property to him; as Count Two, a declaratory judgment that the changing of the locks at the Property and/or the loss or displacement of the Plaintiff's personality was a willful, violation of the automatic stay by defendant, Jean Gardy Bapteau ("Bapteau"), and damages, attorneys' fees and costs; as Count Three, a declaratory judgment that the Plaintiff's right, title and interest in the Property were not affected by a foreclosure sale of the Property held on December 5, 2003; as Count Four, a declaratory judgment that the Plaintiff has a purchaser's lien against the Property and/or any surplus monies in the amount of $15,000.00, arising from his down payment to purchase the Property from defendants Albert Louis ("Louis") and Claudine Belony ("Belony") plus the value of the improvements that he made to the Property; and as Count Five, treble damages against Bapteau arising out of Bapteau's wrongful eviction of the Plaintiff; and

WHEREAS, Bapteau served and filed an Answer and Counterclaim on March 10, 2004, the Plaintiff served and filed a Reply to the Counterclaim on March 16, 2004, and the Plaintiff filed a Notice of Pendency of this action with the Queens County Clerk on February 9, 2004; and

WHEREAS, the Plaintiff moved for summary judgment against Bapteau on Counts One, Three, and Four of the Complaint, and for a default judgment against co-defendants, Louis, Belony, Milthy Gomez and Angela Pisciotta on all Counts; and

WHEREAS, Bapteau opposed the motion for summary judgment and cross-moved for summary judgment and for relief from the automatic stay, or in the alternative, for adequate protection; and

WHEREAS, the defendants Louis, Belony, Gomez and Pisciotta have not appeared or answered the Complaint, or opposed the motion for a default judgment; and

WHEREAS, the motion for summary judgment, cross-motion for summary judgment, and motion for a default judgment were heard by the Court on November 30, 2004, and after due consideration of the submission by the parties, the arguments of counsel, and the record before the Court, the Court rendered a Memorandum Decision dated March 30, 2005, granting in part the Plaintiff's motion for summary judgment, granting in part the Plaintiff's motion for a default judgment, denying Bapteau's cross-motion for summary judgment, and granting in part Bapteau's motion for relief from the automatic stay; it is hereby

ORDERED, that the Plaintiff's motion for summary judgment is granted to the extent that it is hereby declared and decreed that the Plaintiff has a right to redeem the Mortgage on the Property, that the Plaintiff's interest in the Property was not affected by the foreclosure sale, and that the Plaintiff has a purchaser's lien on the Property in the amount of $15,000, and is otherwise denied without prejudice; and it is further

ORDERED, that the Plaintiff may enforce his rights under applicable state law with respect to his right to redeem the Mortgage on the Property, and upon the Mortgage being redeemed, a deed should be executed transferring title to the Property to the Plaintiff; and it is further

ORDERED, that the Plaintiff's motion for a default judgment against Louis, Belony, Gomez and Pisciotta is granted as to Counts One, Three, and Four of the Complaint; and is otherwise denied without prejudice; and it is further

ORDERED, that Bapteau's cross-motion for summary judgment against the Plaintiff is denied without prejudice; and it is further

ORDERED, that Bapteau's motion for relief from the automatic stay is granted to the extent that Bapteau is entitled to adequate protection of his interest in the Property in the form of monthly cash payments in the amount of $1,000, or such lesser amount as may be approved by the Court by written order obtained on notice to Bapteau, for so long as Bapteau remains the legal owner of the Property; and is otherwise denied without prejudice.